**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

MICHAEL LAIDLER,

        Plaintiff,

vs.                                     CIVIL NO. 04-1183 LFG/DJS

ALBUQUERQUE POLICE
DEPARTMENT, and
CORRECTIONAL MEDICAL
SERVICES, INC.,

        Defendants.

**MEMORANDUM OPINION AND ORDER
GRANTING MOTION FOR SUMMARY JUDGMENT
AND DISMISSING PLAINTIFF'S CLAIMS AGAINST CMS**

THIS MATTER is before the Court on Defendant Correctional Medical Services, Inc.'s ("CMS") Motion for Summary Judgment [Doc. 47]. The Court considered the motion, response [Doc. 54] and Reply [Doc. 56], and determines that oral argument is not necessary.[1] After a careful review of the pleadings, attachments and pertinent law, the Court determines that summary judgment should be granted in favor of CMS and, accordingly, that Laidler's claims against CMS will be dismissed, with prejudice. The Court's reasoning follows.

**Background**

Plaintiff Michael Laidler ("Laidler") brought this lawsuit against Bernalillo County, the City of Albuquerque (including the Albuquerque Police Department and the City's operation of Bernalillo County Detention Center), and CMS, seeking monetary damages for alleged violations of his Fourth,

---

[1] The Court denied Plaintiff's motion for leave to file a surreply. [Doc. 59.]

Eighth and Fourteenth Amendment rights. He also asserts various torts purportedly arising under the New Mexico Tort Claims Act.

In the Initial Pretrial Report, Laidler contends that on September 26, 2002, he was arrested by the Albuquerque Police Department on a parole violation charge--felon in possession of a firearm. During the course of his arrest, Laidler alleges that City police officers broke his left wrist while handcuffing him. Laidler asserts that he was taken to an Albuquerque Police Sub-Station, handcuffed to a water pipe, and left there for four hours before being transported to the Bernalillo County Detention ("BCDC") facility. While incarcerated at BCDC, Laidler states that he repeatedly sought medical attention for his left wrist and hand, but was not treated with respect to the hand/wrist injury, nor given medication for hypertension, a high-blood pressure condition, from which he also suffered. In addition, Laidler's Amended Complaint alleges that he suffered a stroke on September 28, 2002, two days after he was arrested and incarcerated. [Doc. 1, Amended Complaint, at ¶ 17.]

Laidler's claims against Bernalillo County were summarily dismissed [Doc. 17] and his claims against the City of Albuquerque, with respect to the City's operation of BCDC, were resolved [Doc. 46]. Thus, the only remaining Defendants are CMS and the City's Albuquerque Police Department. This Motion and Order concern only those claims asserted against Defendant CMS.

In his Amended Complaint, Laidler sets forth six separate causes of action apparently against all Defendants. [Doc. 1, Amended Complaint.] Throughout the complaint, Laidler alleges that he was not provided with adequate medical care, that Defendants unreasonably failed to treat or alleviate his injuries, and that he had the right not to be exposed to a substantial risk of "injury aggravation." In carefully reviewing the complaint, it appears that Laidler's six causes of action actually boil down

to two against CMS: inadequate medical care/medical negligence;[2] and deliberate indifference in violation of Laidler's Eighth Amendment rights.

Thus, while six separate claims purportedly are set out against all Defendants, the Court considers the Amended Complaint to raise only two claims against CMS. This is consistent with the briefing by the parties. Plaintiff's opposition brief does not argue that he brings other claims against CMS that are not addressed in the summary judgment pleadings. Accordingly, resolution of the two claims in favor of CMS disposes of Plaintiff's entire case against CMS. To the extent that there are separate claims raised against the City Police Officers, those claims remain.

## Summary Judgment Standard

Summary judgment is appropriately granted when the moving party can demonstrate by an affirmative showing of evidence that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 26; Adickes v. S.H. Kress & Co., U.S. 144, 90 S. Ct. 1598 (1970); Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir. 1995). Summary judgment is not a "disfavored procedural shortcut." Rather, it is an important procedure designed to "secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

The party moving for summary judgment must shoulder the initial burden of establishing the absence of a question of material fact. Adickes, 398 U.S. at 154. That burden is carried when the moving party demonstrates by way of admissible evidence, that is, by deposition, answers to

---

[2] For example, Laidler alleges that CMS had actual knowledge of a substantial risk to his health, had a duty to use ordinary care in furnishing medical care to him, and breached that duty. [Doc. 1, Amended Complaint, ¶¶ 53, 54.]

3

interrogatories, admissions, affidavits or other admissible documentary evidence that the undisputed facts entitle the moving party to judgment as a matter of law.  Celotex, 477 U.S. at 327.

Once the party makes a *prima facie* showing of its entitlement to judgment, the burden shifts to the presence of a genuine issue for trial.  Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  The non-moving party may not discharge its burden by simply relying on its pleadings or mere argument or contention.  Id.  Rather, the opposing party must set forth specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial.  Celotex Corp., at 324; Mitchell v. City of Moore, 218 F.3d 1190, 1197, 98 (10th Cir. 2000).  Indeed, this requirement is made specifically clear in the rule itself:

> [A]n adverse party may not rest upon mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided by this rule, must set forth specific facts showing there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 26.  *See also* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Biester v. Midwest Health Servs., Inc. 77 F.3d 1264, 1266 (10th Cir. 1996) (discussing summary judgment standard and proof required).

Thus, the burden on the party opposing a motion for summary judgment is significant when the moving party has made a *prima facie* showing.  The test is not whether the adverse party will be able to demonstrate a genuine issue at the time of trial, but, rather, whether the adverse party can demonstrate the presence of a genuine issue of material fact in response to the moving party's *prima facie* showing of entitlement to summary judgment at the time of motion practice.  Notwithstanding the opposing party's burden, the factual record, along with any reasonable inferences that may be drawn therefrom, must be examined in the light most favorable to the party opposing summary

judgment. Spaulding v. United Transp. Union, 279 F.3d 901, 904 (10th Cir.), *cert. denied*, 537 U.S. 816.

### CMS's Motion for Summary Judgment

As stated *supra*, Laidler asserts two claims against CMS: (1) common law medical negligence (*see* Amended Complaint for Damages, Doc. 1, ¶¶ 53-55); and, (2) an Eighth or Fourteenth Amendment claim for cruel and unusual punishment claiming deliberate indifference to his serious medical needs (Doc. 1, *see, e.g.,* ¶¶ 41, 42, 45).

CMS seeks summary judgment on both claims. First, CMS moves to dismiss Laidler's medical negligence claim, noting that it provided expert medical testimony demonstrating that Laidler neither suffered a broken hand/wrist nor a stroke while in custody and that he received appropriate medical attention while in custody. In contrast, Laidler did not identify any medical expert to provide opinion testimony to rebut CMS's showing, has not produced a Fed. R. Civ. P. 26(a)(2) expert report, and, therefore, cannot present any expert testimony to support a medical negligence theory.

Laidler argues that a medical expert is not required in this case under the "special relationship" doctrine, wherein the "state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual . . . ." [Doc. 54, p. 14.] In addition, Laidler asserts that in cases "where professional judgment is at issue, the courts have found that a medical expert is not required." [Id.]

CMS also moves to dismiss Laidler's Eighth Amendment deliberate indifference claim, arguing that Laidler cannot produce any evidence to demonstrate, as he must, "acts or omissions [by CMS] sufficiently harmful to evidence deliberate indifference to [Laidler's] serious medical needs."

Estelle v. Gamble, 429 U.S. 97, 104 (1976). CMS sets forth extensive undisputed facts regarding the care it provided to Laidler during his incarceration. [Doc. 48, pp. 1-8.]

In response, Laidler argues that he gave notice to CMS of his medical needs and CMS did not provide appropriate medical care. Thus, according to Laidler, CMS disregarded "a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights." [Doc. 54, p. 12.] In support of his position, Laidler alleges that he provided specific medical information to CMS personnel about his injured hand/wrist during his intake screening and yet that information was omitted from medical forms and/or those forms were falsified by omitting information Laidler supplied to CMS.

## Undisputed Material Facts

The Court will not recite, at length, the many undisputed facts presented by CMS concerning medical attention Laidler received during his incarceration. Briefly stated, there are approximately 32 medical records, progress notes, medical test results and Laidler's written requests for health care along with CMS's responses, attached to CMS's brief documenting care and treatment provided to Laidler during a 19-day period (from 9/26/02 through 10/15/02). [Doc. 48, Ex. A and B.] Those records reflect prior medical conditions Laidler described during his intake screening on September 26, including prior care for chest pain at UNMH (University of New Mexico Hospital) and related medications that were prescribed, allegations by Laidler that he suffered a stroke 3 weeks before being arrested, Laidler's high blood pressure during the intake process that precipitated the doctor placing him in the infirmary, additional medications prescribed for Laidler's continuing high blood pressure, results of blood pressure monitoring, complaints of chest pain, physical exams by CMS health care providers, review of UNMH records by CMS with respect to Laidler's complaints of chest

pain and a prior stroke, EKG testing and results that turned out normal, Laidler's October complaints regarding left hand pain, physical examination of the hand, x-ray studies of the hand, and prescriptions for pain medications.

In addition, CMS attached a report from UNMH regarding Laidler's medical treatment in late August 2002 related to his complaints of left chest pain that radiated down his left arm and leg. [Doc. 48, Ex. C.] In treating Laidler in September 2002, CMS requested and reviewed the UNMH records. Th UNMH report indicates that Laidler's cardiac catheterization was normal, an echocardiogram was normal, a CT scan to rule out aortic dissection was normal, and a CT scan and MRI of the brain were normal. Thus, UNMH ruled out cardiac and neural causes of the chest pain and suspected the pain was secondary to hypertension. [Ex. C-1.] Laidler's later allegations that he had suffered a stroke during August 2002 appear unconfirmed. Instead, UNMH provided discharge diagnoses of "hypertension" and "probable transient ischemic attack."[3]

Virtually all of the above-discussed medical documentation is unrebutted by Laidler, even though Laidler states that he disputes virtually all of those facts. Notwithstanding his attempted challenges to the facts, Laidler provides little or no admissible evidence to contest the medical records [Doc. 48, Ex. A-C], nor does Laidler provide any admissible evidence to dispute Dr. William Shannon's affidavit testimony [Doc. 48, Ex. D] discussing the medical care provided to Laidler and that CMS provided care to Laidler that was "at or above the standard of care common to the medical community."

---

[3]"A transient ischemic attack (TIA) is a transient stroke that lasts only a few minutes. It occurs when the blood supply to part of the brain is briefly interrupted. TIA symptoms, which usually occur suddenly, are similar to those of stroke but do not last as long. Most symptoms of a TIA disappear within an hour, although they may persist for up to 24 hours. Symptoms can include: numbness or weakness in the face, arm, or leg, especially on one side of the body; confusion or difficulty in talking or understanding speech; trouble seeing in one or both eyes; and difficulty with walking, dizziness, or loss of balance and coordination." http://www.ninds.nih.gov/disorders/tia/tia.htm

Laidler's primary attack on the undisputed facts consists of his own affidavit statement to the effect that he informed CMS medical intake personnel of the injury to his hand/wrist during the intake interview and continually informed CMS medical providers of that injury, yet received inadequate or no medical care.[4] [Doc. 54, Ex. 1.] Laidler argues that the lack of care for his hand resulted in the collapse of his knuckle which required surgery. [Doc. 54, p. 10, Ex. 10.][5] Laidler also attached three grievances as exhibits regarding his complaints of inadequate medical attention, and yet it appears only two were filed with or received by prison authorities. [Doc. 54, Exs. 4, 5, 6.] In addition, Laidler contends that he did not receive medication to treat his hypertension on a consistent basis and that he demonstrated the "typical symptoms" of a heart attack and/or stroke because his high blood pressure was not being controlled. [Doc. 54, p. 8.] Yet, it is noteworthy that Laidler makes only passing reference to allegedly suffering a stroke or heart attack while in custody and never asserts that the unconfirmed stroke/heart attack resulted in any kind of lasting injury. Finally, Laidler challenges the medical records as having been falsified to omit certain medical information that Laidler supplied to CMS personnel, information which he believes should have prompted appropriate medical attention.

Laidler challenges some of Defendant's other proposed facts, yet those areas of dispute do not pertain to material issues. For example, Laidler asserts that one of the early medical records

---

[4]*See* discussion *infra* as to why the Court will not consider this portion of Laidler's affidavit testimony.

[5]Exhibit 10, attached to Laidler's response, is a medical report from the Orthopedic Department of University Hospital, dated September 23, 2004. Thus, it describes treatment Laidler sought and received about two years after the period of incarceration at issue. The "Final Report" states that Laidler had complained of left hand pain "for the last four months, slightly progressive." [Ex. 10.] The 2004 x-ray indicated a healed fracture of the ring finger metacarpal shaft, which is consistent with 2002 x-rays taken by CMS. The plan was to send Laidler to Occupational Therapy for "intrinsic stretching." If that failed, there were surgical alternatives but the physicians hoped that physical therapy would achieve the goals. Thus, this record does not support Laidler's argument that his supposed untreated wrist/hand fracture from 2002 handcuffing resulted in a collapsed knuckle requiring surgery. The record neither mentions a "collapsed knuckle" nor recommends surgery.

indicating that he informed medical staff of a car accident he was involved in two days prior to his arrest is untrue because Laidler was not involved in a car accident. Laidler also argues that CMS was incorrect in stating exactly where he was placed during certain portions of his incarceration. The Court concludes that these disputed areas of fact are not material to deciding the two claims at issue.

## Analysis

### A. Medical Negligence

CMS challenges Laidler's medical negligence claim due to Laidler's failure to offer any medical expert who would provide opinion testimony in support of his claim. It is true that Laidler neither identified a medical expert nor provided any expert medical testimony in support of his medical negligence claim.

"The testimony of a medical expert is generally required when a physician's standard of care is being challenged in a medical negligence case." Lopez v. Reddy, 137 N.M. 554, 556 (Ct. App. 2005) (*citing* Lopez v. Southwest Community Health Servs., 114 N.M. 2, 7 (Ct. App.), *cert. denied,* 113 N.M. 690 (1992)). In the 1992 Lopez case, the Court of Appeals held that "[i]n a medical malpractice case, because of the technical and specialized subject matter, expert medical testimony is usually required to establish departure from recognized standards in the community." *See* Gerety v. Demers, 92 N.M. 396, 411 (1978) ("experts are ordinarily indispensable to identify and elucidate for the fact-finder the risks of [treatment] and consequences of leaving existing maladies untreated, as well as the cause of injuries or disability and the nature and seriousness of any impact upon the patient from risk disclosure"). *See also* Pharmaseal Laboratories v. Goffe, 90 N.M. 753, 758 (1977) ("negligence of a doctor in a procedure which is peculiarly within the knowledge of doctors, and in which a layman would be presumed to be uninformed, would demand medical testimony as to the

standard of care"). Moreover, the New Mexico Court of Appeals expressly stated in Eis v. Chestnut, 96 N.M. 45, 46 (Ct. App.), *cert. denied,* 96 N.M. 116 (1981), the following admonition:

> Absence some glaring error such as inadvertently leaving a surgical instrument inside a patient, a plaintiff must offer expert testimony to defeat a defendant's motion for summary judgment when defendant has presented expert testimony that he was not negligent.

Here, Laidler is challenging the standard of care with respect to medical attention provided to him. For example, he alleges that Defendants unreasonably failed to alleviate his wrist/hand injury, that through their care or lack thereof, his condition was aggravated, and generally that he did not receive the appropriate medical care for his hand/wrist or hypertension.[6]

CMS provided expert testimony in the form of Dr. Shannon's affidavit testimony that Laidler's left hand and wrist were not broken at any time during his arrest from 9/26/02 to 11/27/02, his medical conditions, including his high blood pressure, were addressed upon his arrival at BCDC, CMS provided appropriate medical care upon Plaintiff's first complaint of pain regarding his left hand/wrist (on October 7, 2002 as documented by the medical records), by x-raying the hand/wrist and confirming there was no current fracture and providing pain medications, Laidler did not suffer a stroke while in custody during this period of time, Laidler's requests for health care services were

---

[6]Laidler attempts to argue that he is not claiming medical negligence based on Defendant CMS's negligent treatment of Laidler, and instead argues CMS negligently failed altogether to treat Laidler. This argument is not supported by Laidler's amended complaint. *See, e.g.,* Amended Complaint, at ¶¶ 53,54. Notwithstanding counsel's argument in the brief, Laidler's complaint alleges that CMS failed to diagnose, failed to provide adequate treatment, failed to use ordinary care in furnishing medical treatment and failed to "apply the knowledge and use the skill and care, ordinarily used by well-qualified medical groups and specialists . . . ." Moreover, even if the complaint alleged only the complete failure to treat Laidler's condition(s), the undisputed facts demonstrate that CMS was vigilant in timely responding to Laidler's complaints, prescribing appropriate medications, and providing proper medical testing and care. CMS's expert medical testimony, along with the numerous medical records describing medical treatment and care belie Laidler's contention that his medical conditions went untreated. [Doc. 48, Exs. A-C.]

10

handled appropriately, and all care rendered to Laidler was "at or above the standard of care common to the medical community." [Doc. 48, Ex. D.]

Laidler provides no expert testimony in response to CMS's medical expert's testimony. Instead, he argues that under the circumstances of this case, a medical expert's testimony is not necessary. Laidler cites a number of cases in support of his position, yet none of these cases deals directly with the question of whether expert medical testimony must be presented in a medical negligence case. Indeed, the cases relied upon by Laidler do not concern a medical negligence claim, and most of them do not even mention expert testimony. *See, e.g.,* Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995) (question of qualified immunity addressed in a case where husband of an activity therapist, who was killed in a mental hospital by a patient, asserted § 1983 claims claiming that the state mental health administrators caused the therapist's death by eliminating a special unit in the mental hospital reserved for the criminally insane), *cert. denied,* 516 U.S. 1118 (1996); DeAnzona v. Denver, 222 F.3d 1229, 1234 (10th Cir. 2000) ("special relationship" doctrine discussed in case where parents of drowned child sued city day-camp program for negligence in son's death and violation of the child's substantive due process rights)

In Whitley v. New Mexico CYFD, 184 F. Supp. 2d 1146 (D.N.M. 2001), another case cited by Laidler, the primary question was whether the defendants were entitled to qualified immunity on claims pertaining to a child in the foster care system who was allegedly raped. The guardian of the child brought § 1983 claims against the state agency and social workers, etc. alleging violation of the child's due process rights to be safe from harm. There was no medical negligence claim. In Whitley, the court discussed the "special relationship" doctrine which exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection that person. Id. at

1154-55.  The court mentioned this doctrine in relation to prisoners as well, i.e., that when the State takes a person into custody and hold him there against his will, the Constitution imposes upon the State a duty to assume "some responsibility for his safety and general well-being."  Id. at 1155.

The Whitley case is easily distinguishable from the present case, both on the facts and the issues of law being decided.  In addition, the trial court in Whitley determined that the standard formulated in Yvonne L. v. NM Dep't of Human Servs., 959 F.2d 883, 893-94 (10th Cir. 1992) (another case cited by Laidler), i.e., regarding what was required to hold social workers liable for injuries suffered by children in state foster care, was not the same standard required to show negligence.  Id. at 1155-56.  The applicable standard under those circumstances (in Yvonne L. and Whitley) was more akin to a showing of "deliberate indifference."  Id. at 1156.  Consequently, the trial court found that the Yvonne L. standard (deliberate indifference) was unrelated to professional malpractice and did not require expert testimony to establish standard of care.  Id.

Based on the Court's reading of Whitley and Yvonne L., those cases actually contradict Laidler's position that expert testimony is not required in medical negligence cases.  Indeed, Whitley and Yvonne L. stand for the proposition that expert testimony is not required, with respect to actions of social workers, when proving a claim of deliberate indifference.  Those cases imply that expert testimony is required to prove medical negligence claims, similar to the first claim at issue here. While Laidler's also raises a deliberate indifference claim, CMS does not argue that medical expert testimony is required to prove the deliberate indifference claim.

Finally, Laidler's position that "there is no standard of care that can be established for comparison, because by Defendant CMS's own admission, Plaintiff Michael Laidler['s] broken left hand and wrist were not treated" [Doc. 54, p. 15] is simply untrue.  The Court finds no such

12

admission by CMS. Instead, its medical expert testifies that Laidler's hand/wrist was not broken during the period of incarceration. Laidler's subjective belief that his hand or wrist was broken in the police encounter is simply not supported by any medical evidence. Moreover, the unrebutted medical reports, including two x-rays, fail to show any wrist or hand fracture of recent origin. Both reports refer to a healed fracture that occurred when Laidler suffered a gunshot wound in 1994.[7]

Laidler failed to supply medical expert testimony or any other admissible evidence to demonstrate the existence of a material issue of fact in dispute to rebut CMS's *prima facie showing* that it is entitled to summary judgment on the medical negligence claim. Therefore, Laidler's medical negligence claim will be dismissed with prejudice.

### B.   Deliberate Indifference

CMS argues that none of its actions or alleged omissions rose to the level of deliberate indifference, and that Laidler failed to produce any evidence to support his allegation that CMS was deliberately indifferent to Laidler's medical needs.

#### 1.   *Legal Standard*

The United States Supreme Court first recognized a claim for deliberate indifference to a prisoner's medical needs in Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285 (1976). The Court held that "prison officials violate the Eighth Amendment's ban on cruel and unusual punishment if their 'deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain.'" Self v. Crum, __ F.3d __, 2006 WL 541248 at *2 (10th Cir. Mar. 7, 2006) (*quoting* Estelle, 429 U.S. at 104). To succeed with an Eighth Amendment claim of deliberate

---

[7]To the extent that Laidler thought he could rely on the Internet article about ganglion cysts [doc. 54, ex. 9] as some type of "expert" evidence, he is mistaken. The article is inadmissible hearsay.

indifference, it is not enough to demonstrate "inadvertent failure to provide adequate medical care" nor is it sufficient to demonstrate that a doctor was negligent in diagnosing or treating a medical condition. Self, at *2 (internal citation omitted). Rather, Laidler "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Id. (internal citation omitted).

In Farmer v. Brennan, 511 U.S. 825 (1994), the Supreme Court clarified the standard required to satisfy a claim of deliberate indifference by setting forth a two-pronged inquiry, comprised of an objective and a subjective component. Self, at *3. "Under the objective inquiry, the alleged deprivation must be 'sufficiently serious' to constitute a deprivation of constitutional dimension. . . . [U]nder the subjective inquiry, the prison official must have a 'sufficiently culpable state of mind.'" Id. (*quoting* Farmer, 511 U.S. 834).

> In describing the subjective component, the Court made clear a prison official cannot be liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must draw the inference." . . . The subjective component is akin to "recklessness in the criminal law," where, to act recklessly, a "person must 'consciously disregard' a substantial risk of serious harm."

Id. (internal citations omitted). The Tenth Circuit clarified further that the subjective component is not met where, for example, a prison nurse misdiagnosed a condition and failed to recognize symptoms suggesting an impending heart attack. Id. at 3 (*citing* Sealock v. Colorado, 218 F.3d 1205, 1211, 1212 n. 7 (10th Cir. 2000)). Moreover, a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment generally does not satisfy the constitutional requirements of the deliberate indifference claim. Id. at *4.

14

Thus, "deliberate indifference is a stringent standard of fault." Board of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 410 (1997). The subjective component of the claim "presents a high evidentiary hurdle to the plaintiffs: a prison official must know about and disregard a substantial risk of serious harm." Self, at *4 (internal citation omitted).

The Tenth Circuit further explained in Self that a claim of deliberate indifference is only actionable where the need for additional treatment is obvious. Id. at *5. Obviousness, while not subject to a precise formulation, requires direct or circumstantial evidence. Id. For example, the requirement would be satisfied if a medical professional fails to treat a medical condition that would be obvious to a layperson, like a gangrenous hand or a serious laceration. Id. While the plaintiff does not face insurmountable obstacles in satisfying such a claim, a plaintiff will fail if the medical professional "provides a level of care consistent with the symptoms presented by the inmate, absent evidence of actual knowledge or recklessness." Id. Finally, in Mata v. Saiz, the Tenth Circuit noted that the "medical judgment of the physician, even if grossly negligent, is not the subject to second guessing in the guise of an Eighth Amendment claim." Mata, 427 F.3d 745, 751 (10th Cir. 2005).

To avoid summary judgment on the deliberate indifference claim, Laidler must make two showings: (1) objective seriousness of the medical risk he faced; and (2) CMS's culpable state of mind. Self, at *5. In this case, Laidler fails to make either showing, either with respect to his allegations regarding his hand/wrist or possible stroke

### 2. *Objective Seriousness Prong*

Laidler's allegation that his hand was broken by police officers at the time of his arrest, or that he had a broken hand or wrist while in custody, was clearly refuted by the undisputed evidence. No

15

medical evidence supports that contention, and Laidler has not produced any medical expert to testify that either Laidler's hand or wrist was broken, or that it went undiagnosed or untreated.

While there is evidence demonstrating that Laidler suffered hand and wrist pain a week or more after his intake screening, there is no evidence linking the pain to his arrest on September 26, 2002. However, there is evidence supporting an alternative cause for his pain, i.e., the 1994 bullet wound and resulting fracture. The fracture to his fourth metacarpal had been healed and the healed fracture was confirmed by several sets of x-rays taken by CMS. There is also evidence that Laidler had a ganglion cyst on his left hand, but that the cyst was examined and treated.

Even if Plaintiff were able to demonstrate that he had a fractured hand/wrist that went untreated when he was arrested on September 26, 2002, this is not the type of injury that is sufficient serious to satisfy the prong of "objective seriousness". In other words, at most, Laidler asserts that he had pain in his left hand and wrist, and that he complained of pain. He is unable, however, to establish that his hand or wrist pain resulted in "life long handicap, permanent loss, or considerable pain." Garrett v. Stratman, 254 F.3d 946, 950 (10th Cir. 2001).

In contrast, if Laidler were able to demonstrate evidence that he suffered a stroke when arrested or during his incarceration and was not treated for the stroke, most likely, he would be able to satisfy the "objective seriousness" prong. Yet, there is a total absence of evidence to demonstrate that Laidler suffered a stroke. Indeed, the cerebral vascular event of which he complained he suffered weeks before his arrest was not verified by UNMH doctors in their August 2002 report. [Doc. 54, Ex. C-1, p. 2.] Moreover, as discussed above, Laidler barely mentions the possibility of a stroke in his briefing and alleges no resulting injury from the unconfirmed stroke.

In addition, the UNMH doctors treated Laidler's hypertensive condition with Norvasc,[8] Clonidine (also used to treat high blood pressure) and aspirin — the same medications continually prescribed to Laidler while in custody in September and October 2002.[9] Finally, CMS's medical expert submitted an affidavit stating that Laidler did not suffer a stroke while in custody. That affidavit testimony is not rebutted by any evidence. [Doc. 54, Ex. D.] Thus, it is apparent that while Laidler suffered from high blood pressure, his condition was adequately monitored and treated by CMS. Accordingly, the Court concludes that Laidler failed to satisfy his burden of demonstrating a sufficiently serious medical condition either in relation to the alleged hand/wrist injury or a stroke.

### 3. *Culpable State of Mind Prong*

Laidler also fails to present evidence of CMS's "culpable state of mind." Laidler contends that the medical reports submitted are not complete because he made complaints that do not appear on some of the initial screening and medical records. He argues, without any admissible evidence,[10] that the medical records must have been falsified because he is certain he reported problems with his hand/wrist during the medical screening process. In his affidavit, Laidler testified: "I disclosed all of the information relevant to my medical conditions [during his medical screening], including the fact that my left hand and wrist were hurting because I believed that my wrist had been broken when I was handcuffed." [Doc. 54, Ex. 1, ¶ 4.] Yet, Laidler's January 2006 affidavit testimony to this effect is

---

[8]Norvasc or "Amlodipine is used to treat high blood pressure or chest pain (angina)." www.webmd.com

[9]In a continuing attempt to reduce Laidler's blood pressure, CMS also prescribed HCTZ and Lasix for Laidler. HCTZ is known as /hydrochlorothiazide and is a water pill or diuretic that decreases the amount of the water in the body and assists in lowering blood pressure. http://www.healthline.com/drugs and reserpine. Lasix is also a diuretic.

[10]Laidler's unsupported and unsubstantiated allegations that he believed or knew he told intake personnel of his purported hand condition are of no assistance to him. "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." Phillips v. Calhoun, 956 F.2d 949, 951 n. 3 (10th Cir. 1992).

17

belied by his earlier deposition testimony, wherein he testified that he remembered telling intake personnel that he had high blood pressure and perhaps dental problems but did not remember if he complained about his hand. The exact testimony follows:

> Q: Do you remember telling them [intake personnel] that you had hypertension, down under Medical History?
>
> A. I told them that I had high blood pressure when I first seen them.
>
> Q. Do you remember telling them that you had medical problems that they didn't know about?
>
> A. I don't remember if I complained about my hand, but I don't see it listed on here.

[Doc.56, Laidler Dep. at 118, Ex. E.]

Laidler's conflicting affidavit and deposition testimony are impermissible attempts to create a sham issue of fact for purposes of defeating summary judgment. In Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir.1986), this Circuit recognized that a court may disregard an affidavit which is contrary to previously sworn testimony when the court determines that the affidavit seeks to create "sham issues." Here, Laidler was deposed with his attorney present, and to the extent there was confusion in the question or answer, his attorney could have clarified any misunderstanding during cross-examination of his client. The deposition testimony does not indicate any confusion on Laidler's part about what information he gave to the screening personnel. Indeed, he volunteered that he did not remember telling intake personnel of his hand. Thus, the Court disregards Laidler's contradictory affidavit testimony with respect to his allegation that he told screening personnel of an alleged injury to his hand.

Moreover, the medical records simply are not consistent with Laidler's assertions that he continuously informed CMS of an alleged injury to his hand. This is true because the early records

reflect various information, conditions and complaints provided by Laidler, including specific medications he was taking, his prior medical problems for which he was seen at UNMH, dental problems and hypertension. [Ex. A-1.] Because he had high blood pressure at intake, Laidler was sent to the infirmary, where his blood pressure was monitored and appropriate medications were dispensed. Medications and blood pressure readings again are noted on the medical records. [Exs. A-1, A-2, A-3, A-4, A-5.] On a medical form, entitled CMS-Intake Chart Audit, the only medical conditions listed are "HTN Stroke 3 weeks ago". [Ex. A-7.] Laidler signed it and certainly could have written in a complaint about his hand, if it was not properly recorded on the form. September 28 medical notes indicate that Laidler complained of chest pains, yet the note does not reflect anything about a possible injury to his hand.

In addition, a September 30, 2002 health services request form that Laidler himself filled out and signed sets forth complaints about chest pain, sleeping and his teeth, but Laidler writes nothing about a hand injury in the form. [Ex. A-13.] Only when Laidler was seen by the nursing staff on October 3, 2002, in response to his September 30, 2002 written complaints, is there a notation in the record by the nurse that Laidler complained of pain in his left hand. [Ex. A-13, bottom half.] As of October 2002, when CMS first received complaints about Laidler's complaints of left hand pain, it began providing pain medications (Naprosyn, an anti-inflammatory medication and Ibuprofen) and treatment, including an x-ray study of the hand that did not show a current fracture or injury. Thus, the records and Laidler's own written requests for medical care do not bear out his contention that the medical records were falsified or that CMS was made aware of his complaints earlier than October 3, 2002.

19

In addition, Laidler does not challenge Defendant's assertion that he was seen on numerous occasions by doctors and nurse practitioners and received treatment for multiple conditions he brought to their attention. Laidler fails to demonstrate "criminal recklessness" on the part of CMS in handling Laidler's medical conditions. There is simply no evidence presented that CMS acted or failed to act believing that harm actually would befall Laidler. To the contrary, the medical record categorically refutes that position. [Doc. 48, Ex. A-D.]

In this case, Laidler presented no evidence satisfying the subjective or objective requirements of an Eighth Amendment claim of deliberate indifference. The Court finds that Defendant has made a *prima facie* showing that it was not deliberately indifferent to Laidler's medical needs, care or treatment. Laidler has failed to rebut the *prima facie* showing by admissible evidence, and, therefore, the Court determines that summary judgment should be granted in favor of CMS on the deliberate indifference claim.

Accordingly, the Court concludes that all of Laidler's claims against CMS should be dismissed with prejudice. The result is that Laidler's remaining claims against the City police officers will proceed.

IT IS THEREFORE ORDERED that Defendant CMS's Motion for Summary Judgment [Doc. 47] is GRANTED and that all of Laidler's claims asserted against CMS are dismissed, with prejudice.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
Chief United States Magistrate Judge